IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| | : | |
| v. | : | NO. 05-432-03 |
| | : | |
| SERGIO VELAZQUEZ | : | |
| | : | |

_____

DuBOIS, J.                                                    June 11, 2012

<u>M E M O R A N D U M</u>

## I.     INTRODUCTION

Defendant Sergio Velazquez is charged by Superseding Indictment with one count of
conspiracy to distribute and to possess with intent to distribute five kilograms or more of cocaine
and one count of distribution of five kilograms or more of cocaine.  Presently before the Court is
defendant's Motion to Dismiss the Indictment for Denial of Right to Speedy Trial ("Speedy Trial
Motion").  The Court held an evidentiary hearing and heard oral argument on April 27 and June
6, 2012.  For the reasons set forth below, the Court denies defendant's motion.

## II.    BACKGROUND

### A.     Investigation, Offense Conduct, and Initial DEA Efforts to Locate Defendant

The charges in this case arise from information that Drug Enforcement Administration
("DEA") Special Agent David Pedrini received from a confidential informant ("CI") in June
2005.  (April 27, 2012, Hr'g Tr. ("4/27/12 Tr.") 6.)  The CI informed Agent Pedrini that
defendant had offered to sell cocaine to the CI.  (Id.)  Defendant traveled from California to
Philadelphia to meet with the CI to discuss the potential transaction.  (Id. at 6–7.)  DEA agents
monitored the meeting, which took place at a Mexican restaurant at 9th Street and Washington

Avenue on July 3, 2005.  (Id. at 6–8.)  Defendant was accompanied by co-defendant Pedro

Curiel, who was to be "the person receiving the cocaine here in Philadelphia and eventually . . .

giv[ing] it to the CI."  (Id.)  DEA agents arranged for the CI to wear a recording device during

the July 3, 2005, meeting, and the device captured, inter alia, an agreement that defendant would

sell the CI "between five and ten" kilograms of cocaine.  (Id. at 7, 10.)

DEA agents arranged for Philadelphia Police Department officers to stop the car in which

defendant and Curiel were traveling after they left the Mexican restaurant.  (Id. at 7–8.)  The

purpose of the traffic stop was to "identify the occupants" of the vehicle.  (Id.)  Defendant

showed the police officers a California driver's license with the name "Sergio Velazquez."  (See

id.)  The police officers conveyed that information to the DEA, which obtained a copy of

defendant's driver's license from the California Department of Transportation, including his

photograph and the address of "PO Box 2901, Bell Gardens, CA, 90201" (hereinafter "PO Box

2901 address").  (Driver's License, Gov't Hr'g Ex. 1, at 1.)  Defendant was not arrested during

the traffic stop, and he returned to California.  (4/27/12 Tr. 9.)  By monitoring defendant's

telephone conversations with the CI, DEA agents learned that defendant arranged for the cocaine

transaction to take place on July 27, 2005.  (Id.)

On July 27, 2005, the DEA covertly monitored Curiel as he met with the CI in

Philadelphia.  (Id.)  They then watched Curiel meet with another co-defendant, Nelson Gutierrez-

Gainza, at a truck stop in Philadelphia.  (Id. at 9–11; see also Superseding Indictment 2.)

Gutierrez-Gainza gave a sack to Curiel, who entered a car and drove away.  (4/27/11 Tr. 9–11.)

DEA agents stopped Curiel and determined that the sack contained nine kilograms of cocaine.

(Id.)  The agents arrested Curiel and Gutierrez-Gainza immediately.  (Id.)  On August 3, 2005,

-2-

government agents issued a Complaint and warrant for defendant, charging him with offenses related to the July 27, 2005, drug transaction.  (Id. at 11–12.)

Agent Pedrini testified to the initial efforts the DEA made in August 2005 to locate and arrest defendant.  When the Complaint and warrant were issued, Agent Pedrini had two addresses for defendant: the PO Box 2901 address and an address that was associated with defendant's name in a law enforcement database, 6340 Woodward Avenue in Bell, California ("Woodward Avenue address").  (Id. at 12–14.)  Agent Pedrini also determined that the Woodward Avenue address was "associated with the PO Box 2901 address somehow."  (Id. at 28.)  Agent Pedrini contacted DEA Special Agent Scott Pascoe—his DEA academy roommate, who was stationed in Los Angeles—and asked him to look into the Woodward Avenue address. (Id. at 12.)  Agent Pascoe went to the address in early August 2005 and spoke to "a male, a female, and two children," who told him that defendant did not live there.  (Id.)  Pursuant to DEA protocol, because he was unable to locate defendant, Agent Pedrini declared defendant a fugitive and transferred apprehension authority to the United States Marshals Service ("USMS") fugitive squad in Philadelphia on August 12, 2005.  (Id. at 12–13.)  During this transfer, Agent Pedrini gave the USMS a "DEA personal history report" regarding defendant and the charges. (Id. at 14.)  The report contained the PO Box 2901 address, and Agent Pedrini verbally informed the assigned Deputy U.S. Marshal, William "Billy" Degan, about the Woodward Avenue address.  (Id.)

**B.      USMS Efforts—August to November 2005**

Deputy Degan was responsible for the fugitive investigation of defendant from the time that the DEA transferred the case until he left his position with the USMS in late November 2005.  (June 6, 2012, Hr'g Tr. ("6/6/12 Tr.") 9, 19.)  Deputy Degan spoke with the DEA case

agents after being assigned defendant's case and learned what efforts the DEA had made to locate defendant.  (Id. at 9–10, 13.)  He entered the defendant's warrant into the National Crime Information Center ("NCIC") Wanted Persons database[1] on August 17, 2005.  (NCIC Records 12–13; 6/6/12 Tr. 11–12.)  On August 19, 2005, Agent Pedrini also entered defendant's information into the NCIC Wanted Persons database.  (NCIC Records 12.)  Then, Deputy Degan entered defendant's biographical information into the Warrant Information Network ("WIN").  (6/6/12 Tr. 6–7; see also Add'l USMS Records, Gov't Hr'g Ex. 4, at 5–6.)  Deputy Degan entered, inter alia, defendant's name, aliases, alien registration number, Social Security number, physical description, driver's license information, and PO Box 2901 address.  (Add'l USMS Records 5–6.)

Deputy Degan also researched defendant's background using NCIC and other commercial and law-enforcement databases, such as Lexis-Nexis and Autotrack.  (See 6/6/12 Tr. 8, 16.)  These databases aggregate publicly available information associated with persons, such as applications for credit, DMV reports, and purchases of property or vehicles.  (4/27/12 Tr. 42, 52–53.)  With the information he gathered, Deputy Degan prepared a collateral request for law

---

[1] The NCIC is "an electronic clearinghouse of crime data" accessible to "virtually every criminal justice agency nationwide."  FBI—National Crime Information Center ("NCIC Info"), Federal Bureau of Investigation (June 7, 2012), http://www.fbi.gov/about-us/cjis/ncic.  The "Wanted Persons" database is one of the twelve "persons" databases maintained by the NCIC, and it contains "[r]ecords on individuals . . . for whom a federal warrant or a felony or misdemeanor warrant is outstanding."  NCIC Files, Federal Bureau of Investigation (June 7, 2012), http://www.fbi.gov/about-us/cjis/ncic/ncic_files.  Once a person's name has been entered into the database, a subsequent search does not necessarily trigger a warning to the agency that placed the name in the database; instead, "NCIC policy requires the inquiring agency to make contact with the entering agency to verify the information is accurate and up-to-date."  NCIC Info., supra; see also 4/27/12 Tr. 24 (Agent Pedrini's testimony that a warrant "is put into the NCIC so if somebody's ran [sic] for a want or a warrant it pops up . . . if he's pulled over and issued a citation, that person, the officer should run the license and the license plate to see if Mr. Velazquez has an active warrant").

enforcement assistance in the Central District of California, where he believed defendant to be located.  (6/6/12 Tr. 13–14.)  Collateral requests are requests to USMS offices in other jurisdictions for assistance in an investigation.  (4/27/12 Tr. 32; see also 6/6/12 Tr. 13.)  In this case, according to Deputy Degan, the request would have been assigned to a USMS deputy or to a member of a Los Angeles–area law enforcement agency that participated in a Los Angeles Task Force.  (6/6/12 Tr. 13, 18, 36–37.)

Deputy Degan's collateral request was dated October 7, 2005.  (Add'l USMS Records 1–2; see also 6/6/12 Tr. 14.)  The request summarized the alleged offense conduct and provided the names of defendant's mother and father, an address for defendant's mother in Pico Rivera, California, and defendant's driver's license information.  (Add'l USMS Records 1.)  The collateral request further stated that DEA agents in Los Angeles had gone to the Woodward Avenue address, which the DEA understood to be associated with the PO Box 2901 address, and interviewed the occupants of the Woodward Avenue address.  (Id.)  The request noted that "[a]gents from Los Angeles also checked a number of other addresses" and provided DEA Special Agent Scott Pascoe as a contact for more information on those efforts.  (Id.)

The collateral request listed six addresses that Deputy Degan believed could be associated with defendant based on his searches of Autotrack and Lexis-Nexis.  (Id. at 2.)  Those addresses included:  (1) "7937 Jaboneria Road, Bell Gardens, CA," which allegedly was a home defendant purchased in 1999; (2) the PO Box 2901 address; (3) "15159 El Camino Avenue, Paramount, CA"; (4) the Woodward Avenue address, which was "associated with Elias Velazquez . . . possible brother of [defendant]"; (5) "2584 Sale Place, Apt. H, Huntington Park, CA," which was "also associated with Cecilio Vasquez," whose relationship to defendant was unknown; (6) "6623 Priam Drive, Bell, CA," which was associated with defendant's mother.

(Id.)  The collateral request stated, "This office asks that you attempt to locate [defendant] in your district. . . . If all leads for [defendant] are exhausted, please interview his parents . . . and his brother."  (Id.)

Deputy Degan testified that he had no specific recollection of his contacts with law enforcement in the Central District of California and did not make any notes of those conversations.  (6/6/12 Tr. 18–19.)  However, he stated that it was his practice to contact someone at the receiving jurisdiction to determine the best manner for submitting the collateral request and to "follow up a day or two later to make sure they received everything they needed." (Id. at 19.)  Deputy Degan also said that once the request was submitted, further communication between the requesting officer and the receiving jurisdiction would generally be informal contact by telephone.  (Id. at 27.)  Although the receiving jurisdiction likely would submit a written report of their efforts to respond to a collateral request and the USMS "standard practice" is to make a written record of "pertinent" information, Deputy Degan opined that it was possible that no report would be submitted if the receiving jurisdiction were still working on the request.  (Id. at 27–28 (testimony of Deputy Degan that "if they were still working on it I wouldn't expect them to close out an ongoing case"); see also 4/27/12 Tr. 84 (testimony of Deputy Ilagan that "[t]he protocol would be to advise the lead Deputy in this case . . . I don't get a response through a formal letter through NCIC, I would get a phone call advising me that an intel information was gained, at what address it is, so I can further investigate and go on from there").

Deputy Degan stated that he did not receive a response to the collateral request before leaving the Philadelphia office of the USMS in late November 2005.  (6/6/12 Tr. 29.)  However, he believed that work was underway on the request because the Los Angeles Police Department ran a query for defendant in the NCIC Wanted Persons database on October 31, 2005.  (Id. at 18;

see also NCIC Records 12.)  Although Deputy Degan stated that responsibility for this case would have been transferred to another deputy marshal, the person to whom this case was transferred was not identified by the witnesses.  (6/6/12 Tr. 19.)  However, the USMS records confirm that someone was working on the case.  (E.g., USMS Records 1.)

### C.   Contact Between Government and Defendant's Counsel; Superseding Indictment and Charges

On November 1, 2005, the Assistant United States Attorney ("AUSA") assigned to the case sent a copy of the Complaint and warrant by facsimile to defendant's counsel, Jerry Kaplan, Esquire, who is based in California.  (4/27/12 Tr. 88.)  Defendant's counsel stipulated that he received the documents, but the parties agreed that, if defendant's counsel had any communication with defendant in regards to those documents, such communications were protected from disclosure by attorney-client privilege.[2]  (Id. at 89.)

Defendant, Curiel, and Gutierrez-Gainza were charged by Superseding Indictment filed November 22, 2005.  Defendant was charged with one count of conspiracy to distribute and to possess with intent to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A), and one count of distribution of five kilograms or more of cocaine, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A).  Arraignment was held on December 15, 2005. Defendant did not appear, although a local attorney who had been appointed to represent him entered an appearance.  During the arraignment, the AUSA stated, "[M]y understanding from my last conversation with Mr. Kaplan [defendant's California counsel] was that he was planning to surrender Mr. Velazquez, but that has not happened.  And I have had no further contact with Mr.

---

[2] The record is silent as to how the AUSA knew the identity of defendant's California attorney.

Kaplan . . . ."  (Dec. 15, 2005, Hr'g Tr. 3.)  Curiel and Gutierrez-Gainza were arraigned, and the

warrant for defendant remained outstanding.[3]

### D.    USMS and DEA Efforts—November 2005 to November 2010

The efforts of the USMS and DEA to locate defendant between November 2005 and

November 2010 were limited to periodic checks of the NCIC Wanted Persons database and the

commercial databases.  (See, e.g., 4/27/12 Tr. 64 (cross-examination of Deputy Ilagan: "Q. So

when you go back to 2005 and 2010, five years that this gentleman had a warrant out, the only

thing that was done on any of these forms is an NCIC check, correct?  A. And commercial

database.").  Those checks took place in January 2007, September 2007, November 2007,

January 2008, February 2008, October 2008, September 2009, and October 2010.  (See NCIC

Records 1–12; USMS Records 1.)

In addition, between November 2005 and November 2010, no law enforcement agency

contacted the USMS or DEA to inform them that defendant had been arrested or otherwise

located.  All of the government's witnesses conceded that between November 2005 and

November 2010 no law enforcement agency attempted to visit the addresses associated with

defendant.  (E.g., 4/27/12 Tr. 60.)  The USMS did not take any further action because the

database searches "came up with the same things" that they had already checked.  (Id. at 83

(testimony of Deputy Ilagan).)

---

[3] Both co-defendants' cases have since been resolved.  Curiel entered into a plea agreement with
the government on May 18, 2006.  On November 9, 2006, he was sentenced to forty-two
months' incarceration and five years of supervised release.  He was discharged from supervised
release on January 13, 2011.  After a trial in October 2006, Gutierrez-Gainza was found guilty as
to Counts One and Two of the Superseding Indictment.  The Court imposed a sentence of 240
months' incarceration and ten years of supervised release.  The Third Circuit affirmed the
conviction and sentence.  United States v. Gutierrez-Gainza, 284 F. App'x 975 (3d Cir. 2008).

Because the USMS had assumed responsibility for the fugitive investigation, Agent Pedrini had limited involvement in the efforts to apprehend defendant.  Nonetheless, he followed up on the case annually in October by doing three things: (1) contacting the U.S. Attorney's Office to ensure they were still willing to prosecute; (2) making sure the warrant for defendant was still active in the NCIC; and (3) contacting the USMS.  (See id. at 15–18.)  Agent Pedrini noticed in 2008 that the warrant had been removed from the NCIC and contacted a USMS representative to make sure it was reactivated.[4]  (Id.)  Agent Pedrini also, on an unspecified date, had defendant's name and photograph placed on the "most wanted" list on the DEA's Philadelphia office's website.  (Id. at 17.)

### E.    USMS Efforts—November 2010 to December 2011

Deputy U.S. Marshal Enrico Ilagan assumed responsibility for the fugitive investigation in November 2010.  (4/27/12 Tr. 31.)  He performed an NCIC and database check, and one of the databases returned a result for a new place of employment—a car or truck repair business in California—that was possibly associated with defendant.  (Id.; USMS Records 1.)  Deputy Ilagan conducted a "ruse," in which he contacted the business and "asked for [defendant] by name." (4/27 /12 Tr. 31–32, 41.)  The business "didn't know anything about him or never heard of his name."  (Id.)

Deputy Ilagan continued to perform periodic NCIC and database checks to see if any new information was available.  (Id. at 32.)  In June 2011, a database search showed a link between a

---

[4] A docket entry made on February 14, 2008, states that the arrest warrant for defendant was returned executed on December 6, 2005, but the "Return" portion of the arrest warrant is unsigned and does not identify the arresting officer.  (Warrant Return, ECF Doc. no. 158, at 1.) It states only "DEA" on the "Arresting Officer" line and has a date of "12/6/05."  (Id.)  The warrant's erroneous removal from the NCIC and the entry of the warrant return were not explained during the hearing.

telephone number that had been associated with defendant's PO Box 2901 address and a new address, 12207 Spry Street, Norwalk, CA, which was approximately seven miles from Bell Gardens.  (4/27/12 Tr. 31–32; USMS Records 5.)  Deputy Ilagan decided that the new address justified sending out an additional collateral request to "freshen . . . up" the 2005 request.  (Id. at 32, 43.)  In addition to the information about the Spry Street address, the request, dated June 22, 2011, noted that defendant was "receiving mail at PO Box (POB) 2901, Bell Gardens, CA" and that "the address listed for this POB is 6340 Woodward Avenue . . . an old address" that defendant "used in the past."  (USMS Records 5.)  Deputy Ilagan asked the Central District of California to "use any and all investigative means to locate and arrest [defendant]."  (Id.)

The 2011 collateral request was assigned in California to Deputy David Dominguez on June 22, 2011.[5]  (4/27/12 Tr. 33; Dominguez Records, Gov't Hr'g Ex. 5, at 3.)  Deputy Dominguez contacted Deputy Ilagan to discuss the case.  (4/27/12 Tr. 33.)  On July 7, 2011, Deputy Ilagan received an e-mail "alert notice" that the FBI received a fingerprint submission that matched the fingerprints on file for defendant.  (See 4/27/12 Tr. 34; USMS Records 6.)  Deputy Ilagan learned that defendant had been fingerprinted in connection with his application to the United States Citizenship and Immigration Services[6] ("USCIS") for renewal of his permanent resident card.  (See 4/27/12 Tr. 33–34, 49; USMS Records 6.)  Deputy Ilagan asked the USCIS for assistance in planning a ruse in which defendant would be arrested when he went to the USCIS office in Laguna Niguel, California, to pick up his fingerprint card.  (4/27/12 Tr. 34.)  However, when he "went up the chain of the USCIS they refused to help . . . in

_____

[5] There was no testimony as to which law enforcement agency employed Deputy Dominguez.

[6] Some portions of the exhibits refer to USCIS by its former name, the Immigration and Naturalization Service ("INS") or to its law-enforcement arm, Immigration and Customs Enforcement ("ICE").

apprehending [defendant] inside of their vicinity because of liability purposes."  (Id.; see also id. at 43–44.)

 Deputy Ilagan informed Deputy Dominguez that USCIS was unable to help and that Deputy Dominguez "might have to sit and do surveillance" at the Woodward Avenue address. (Id.)  Deputy Dominguez did not testify at the hearing, but his investigation notes were introduced in evidence.  (6/6/12 Tr. 43.)  Those notes reflect that Deputy Dominguez "sat surveillance" at the Woodward Avenue address on July 15, 2011.  (Dominguez Records 3.) Dominguez did not locate the defendant at that time, although he did record the license plate numbers of two vehicles parked at that address.  (Id.)  Some time in the summer of 2011, Deputy Dominguez also contacted the post office at which defendant maintained his post office box. (Id.)  The post office employees "stated that they did recognize [defendant] but could not provide any further information."  (Id.)  The employees also told Deputy Dominguez that defendant "would not have a set time when he collected his mail, but that he would come often."  (Id.) Deputy Dominguez was "at the post office for half a day" but defendant did not appear.  (Id.)

 During the summer of 2011, Deputy Dominguez also performed surveillance of the Spry Street address that had prompted the 2011 collateral request, with no results.  (Id.)  He contacted Immigration and Customs Enforcement ("ICE"), which "provided the same PO BOX address." (Id.)  Deputy Dominguez identified two additional vehicles and one additional address he believed might be associated with defendant, but he was unsuccessful in finding defendant.  (Id.) "[D]uring a 3 month span," Deputy Dominguez went to "all three addresses"—presumably the three addresses referenced in his notes, the Woodward Avenue address, the new Spry Street address, and another address—but "could never get any new intell[igence]."  (Id.)  Deputy Dominguez also contacted the Santa Fe Springs Employment Tax Office, which maintains

records of California payroll taxes.  (See id.)  A search for defendant's name and Social Security

number yielded no results.[7]  (Id. at 2.)

Because Deputy Dominguez's efforts to locate defendant were unsuccessful, the

collateral request was "still pending" as of December 2011.  (4/27/12 Tr. 34.)

### F.     Defendant's December 9, 2011, Arrest and Subsequent Proceedings

Defendant was arrested on local narcotics charges in Glendale, California, on December

9, 2011.  (4/27/12 Tr. 18; NCIC Records 2; USMS Records 7.)  A California DEA agent

contacted Agent Pedrini to notify him of defendant's arrest and to ask whether the government

still intended to prosecute this case.  (4/27/12 Tr. 18–19.)  Agent Pedrini responded that it did,

(id.), and a deputy U.S. marshal for the Central District of California executed the arrest warrant

for defendant on December 12, 2011.  (Rule 5(c)(3) Documents, ECF Doc. No. 176, at 2.)

Defendant was extradited to this district and had his initial appearance before a magistrate judge

on December 29, 2011.  He filed his Speedy Trial Motion on March 28, 2012.

In April 2012, Agent Pedrini spoke to co-defendant Gutierrez-Gainza, who stated that he

remembers the conduct in this case "like it happened yesterday."  (4/27/12 Tr. 20.)

### G.     Defendant's Evidence of "Open and Notorious" Lifestyle

Defendant offered evidence that, his counsel argued, showed that he was living "open[ly]

and notoriously in California under the name of Sergio Velazquez."  (4/27/12 Tr. 90.)

---

[7] Deputy Ilagan testified that Deputy Dominguez ran a search in July 2011 with a result of "no
wages found."  (6/6/12 Tr. 52–55.)  However, he did not maintain a record of that result.  (Id.)
When Deputy Ilagan contacted him after the April 27, 2012, hearing, Deputy Dominguez ran the
search again; it is the results of that search, performed on May 8, 2012, that the government
introduced in evidence.  (See Dominguez Records 1–2.)  Given that the search was for
defendant's "last known work location with dates of employment" and the result was "no wages
found," (id.), the Court infers that the summer 2011 search returned the same result as the May 8,
2012, search.

Specifically, the following exhibits to his Speedy Trial Motion were received in evidence: (1) correspondence from the USCIS dated September 13, 2011, with the address "PO Box 2037, Bell Gardens, CA" ("PO Box 2037 address"); (2) a copy of a Permanent Resident Card with an expiration date of September 13, 2021; (3) correspondence from the INS dated August 21, 1999, with the address "PO Box 2901, Bell Gardens, CA"; (4) a Bank of America account statement for the period ending September 8, 2011, with the PO Box 2037 address[8]; (5) a record of the birth of Sebastian Velazquez dated October 5, 2005, to Maria Yesenia Rodriguez and defendant; (6) records of the birth of Sergio Emiliano Velazquez dated December 27, 2005, to Irma Contreras and defendant; (7) records of the birth of Sebastian George Emilio Velazquez dated February 22, 2007, to Irma Contreras and defendant; (8) a record of the baptism of Sebastian Velazquez dated May 10, 2008; and (9) an RV insurance bill and vessel registration with the PO Box 2037 address.  (Def. Speedy Trial Mot. Exs.)

The following exhibits to defendant's reply brief were also received in evidence: (1) United States Naval Reserve enlistment documents dated 2002 and 2003 listing, inter alia, defendant's "Home of Record" as the Woodward Avenue address; (2) a completed "Application to Replace Permanent Resident Card," listing defendant's mailing address as the PO Box 2037 address, and his "U.S. Residence Address" as the Woodward Avenue address; (3) an "Appointment Notice" from the USCIS dated June 20, 2011, setting an appointment for July 7, 2011, for defendant at the USCIS office in El Monte, California, and listing defendant's address as the PO Box 2037 address; (4) state identification and Social Security cards for two of defendant's children, listing their address as "13643 Verdura Avenue, Downey, California"; (5)

_____

[8] Deputy Ilagan determined that PO Box 2037 was also "affiliated" with the Woodward Avenue address in postal service records.  (See 4/27/12 Tr. 44.)

additional insurance documents dated in 2010 with the PO Box 2037 address and showing a "garaged location" for a motorcycle as "8121 Alhambra Avenue" in an unspecified city; and (6) defendant's California driver's license, with the PO Box 2901 address.  (Def. Reply Exs.)  As a supplement to the reply brief, defendant also submitted additional Bank of America records that bear the PO Box 2037 address, although there are also five deposit slips with the Woodward Avenue address.

## III.   DISCUSSION

The sole issue presented by defendant's Speedy Trial Motion is whether the pretrial delay violates defendant's Sixth Amendment right to a speedy trial.  For the reasons set forth below, the Court denies the Speedy Trial Motion.

### A.    Legal Standard—Sixth Amendment Right to Speedy Trial

In Barker v. Wingo, the Supreme Court identified four factors courts must consider in determining whether pretrial delay infringes the Sixth Amendment right to a speedy trial: (1) the length of the delay; (2) the validity of the reasons for the delay; (3) whether the defendant affirmatively asserted his right; and (4) whether the defendant was prejudiced by the delay.  407 U.S. 514, 530–532 (1972); see also United States v. Battis, 589 F.3d 673, 678 (3d Cir. 2009).

### B.    Analysis

The Court addresses each of the Barker factors in turn, setting forth the parties' arguments as to each factor and bearing in mind that "Barker prescribes 'flexible' standards based on practical considerations."  Strunk v. United States, 412 U.S. 434, 438 (1973).  "None of these factors is 'either a necessary or sufficient condition,' and the factors 'must be considered together with such other circumstances as may be relevant.'"  Battis, 589 F.3d at 678 (quoting Barker, 407 U.S. at 533).

1.      **Length of Delay**

The first factor, the length of the delay, involves two inquiries.  The first is whether the delay is "presumptively prejudicial" because it has passed "'the point at which courts deem the delay unreasonable enough to trigger the Barker inquiry.'"  Hakeem v. Beyer, 990 F.2d 750, 759 (3d Cir. 1993) (quoting Doggett v. United States, 505 U.S. 647, 650 (1992)).  Courts generally consider a delay to be "presumptively prejudicial" when more than one year elapses between indictment and trial.  See Doggett, 505 U.S. at 652 n.1; cf. Hakeem, 990 F.2d at 760 (surveying cases and holding that delay of fourteen-and-a-half months establishes prejudice).  Once a defendant has shown presumptive prejudice, the Court considers the length of the delay along with the other Barker factors.  As the delay gets longer, it "incrementally add[s] its weight to any actual harm that the record shows the defendant suffered as a result of the delay in question." Hakeem, 990 F.2d at 760.

Approximately six years and seven-and-a-half months will have elapsed between the filing of the Superseding Indictment on November 22, 2005,[9] and the presently scheduled trial date, July 9, 2012.  This time period is sufficient to create a presumption of prejudice.  See Doggett, 505 U.S. at 650.  Thus, the Court will consider the rest of the Barker factors, weighing the delay in the context of "any actual harm that the record shows the defendant suffered."  See Hakeem, 990 F.2d at 760.

---

[9] At the hearing, the government abandoned the argument it advanced in its response—that the relevant time inquiry began only when defendant was arrested in December 2011.  (See Gov't Resp. 8.)  That argument is contrary to the rule that "delay is measured from the date of arrest or indictment, whichever is earlier, until the start of trial." Battis, 589 F.3d at 678 (emphasis added).

2.      **Validity of Reason for Delay**

i.      **Legal Standard**

Barker distinguished between three types of delays: delays caused by the government,

neutral delays, and delays caused by the defendant.  Battis, 589 F.3d at 680 (3d Cir. 2009)

(quoting Barker, 407 U.S. at 531); see also United States v. Dent, 149 F.3d 180, 184–85 (3d Cir.

1998).  In all of these categories, the government "bears the burden to justify the delay."

Hakeem, 990 F.2d at 770.  Courts weigh delays as follows:

> A deliberate effort by the Government to delay the trial "in order to
> hamper the defense" weighs heavily against the Government."
> Barker, 407 U.S. at 531.  A "more neutral reason such as
> negligence or overcrowded courts" also weighs against the
> Government, though "less heavily."  Id.  This is because . . . it is
> the Government's duty to bring a defendant to trial.  Id. at 527,
> 531.  Finally, "a valid reason, such as a missing witness, should
> serve to justify appropriate delay."  Id. at 531.  By contrast, "delay
> caused by the defense weighs against the defendant," including
> "delay caused by the defendant's counsel."  Vermont v. Brillon,
> __ U.S. __, 129 S.Ct. 1283, 1290–91 (2009).

Battis, 589 F.3d at 679–80.

"A defendant cannot complain of any delay attributable to his flight or unavailability."

United States v. Bey, 499 F.2d 194, 203–04 (3d Cir. 1974).  However, the government must

"pursue[] [the defendant] with reasonable diligence from his indictment to his arrest," even when

he is a fugitive.  Doggett, 505 U.S. at 656; see also Dent, 149 F.3d at 184 (holding that the two

years defendant was a fugitive attributable to defendant, but that the fourteen months' delay after

defendant's arrest on other charges outside of jurisdiction was attributable to government).

Whether the government has satisfied the diligence requirement in pursuing a fugitive defendant

is "fact-specific," and "the precise amount of effort that is required is apt to vary depending on

the circumstances of the case."  Rayborn v. Scully, 858 F.2d 84, 90 (2d Cir. 1988).

-16-

### ii.    Parties' Arguments

This prong of the <u>Barker</u> inquiry is the issue most contested by the parties. Defendant argues that the delay is attributable to "official negligence" because the government did not use "any sort of diligence" or make any "serious effort" to locate defendant, who was living openly in California.  (Speedy Trial Mot. 8–9.)  He emphasizes that the government was particularly lax in failing to locate him around the time that the Superseding Indictment was filed in late 2005, given the detailed information it had as to his identity and whereabouts.  (<u>Id.</u> at 9.)  Defendant relies heavily on two cases, <u>United States v. Fernandes</u>, 618 F. Supp. 2d 62 (D.D.C. 2009), and <u>United States v. Mendoza</u>, 530 F.3d 758 (9th Cir. 2008).  (Def. Reply 5–7.)  He asserts that those cases are factually similar to this one and compel a finding in his favor because they stand for the proposition that "[e]ntering a criminal defendant's name into a database as a routine matter does not satisfy the Government's diligen[ce] obligation."  (4/27/12 Tr. 112.)

The government responds that the delay is entirely attributable to defendant's "efforts to evade law enforcement and his deliberate decision to not surrender himself to face the charges when he first became aware of them in November 2005."  (Gov't Resp. 10.)  It asserts that it made reasonable, diligent efforts to locate defendant, who thwarted them by deliberate evasion. (<u>Id.</u> at 10–11.)

### iii.    Analysis

There is no intimation that the government deliberately delayed its apprehension of defendant; the parties dispute only whether the government was reasonably diligent.  <u>See</u> <u>Doggett</u>, 505 U.S. at 656 ("[I]f the Government had pursued [the defendant] with reasonable diligence from his indictment to his arrest, his speedy trial claim would fail . . . however great the delay, so long as [the defendant] could not show specific prejudice to his defense.").  After

careful consideration, the Court concludes that the government has proven it pursued defendant with reasonable diligence.

> ### a. The Government Visited the Woodward Avenue Address in the First Two Weeks of the Investigation and Believed Defendant Did Not Reside There

Within two weeks of the successful interdiction of the drug transaction and the arrests of Curiel and Gutierrez-Gainza on July 27, 2005, Agent Pedrini had obtained defendant's PO Box 2901 address from his driver's license and obtained the Woodward Avenue address through a law enforcement database. Also within those two weeks, Agent Pedrini had contacted Agent Pascoe in California, who went to Woodward Avenue to arrest defendant. Agent Pascoe ascertained that a man, a woman, and two children resided there, but defendant did not. From there, the government followed a trail of post office box addresses, phone numbers, and other addresses that ultimately led to unsuccessful investigations.

The fatal shortcoming in defendant's argument is that, if the documentation defendant provided is to be believed, defendant holds himself out as residing at Woodward Avenue. On the rare occasion when defendant has used an address that is not a PO Box, he has provided the Woodward Avenue address; indeed, it is the one he listed as his residential address on his 2011 application to renew his permanent resident card. (Def. Reply Exs. 11.) That is the same address that Agent Pascoe visited at the outset of the investigation in August 2005, and Agent Pascoe was told that defendant did not reside there. Deputy Dominguez was likewise unable to locate defendant at that residence when he performed surveillance in 2011. Accordingly, the Court concludes that the government's choice to pursue other leads was reasonable.

Defendant cites the concurring opinion in <u>Mendoza</u> for the proposition that "'you can still claim your right to a speedy trial has been violated if you run, but you don't hide.'" (Def. Reply

7 (quoting <u>Mendoza</u>, 530 F.3d at 768 (op. of Bybee, J., concurring)).)  But the government's

inability to locate defendant at the address he claims is his residence—as well as his lack of

employment history and ability to avoid apprehension until his arrest on unrelated charges, even

after the government intensified its efforts in 2011—strongly supports the inference that

defendant did hide.   The Court need not draw that inference, however, because, as the Sixth

Circuit held in rejecting an argument similar to the one advanced by defendant in this case,

"[w]hether or not defendant was intentionally evading authorities, his lifestyle made it difficult

for authorities to track him down. If defendant had not been so transient and if he had lived at his

mailing address instead of using post office boxes, he would have been found much earlier as the

[government] used conventional search methods in a reasonably diligent manner."  <u>United States</u>

<u>v. Mundt</u>, 29 F.3d 233, 236 (6th Cir. 1994).

### b.    The Government Used Reasonable Diligence in its Approach to the Fugitive Investigation

Notwithstanding the government's failure to locate defendant at the Woodward Avenue

address, the entirety of the investigation shows that the government acted with reasonable

diligence.  Deputy Degan, who knew what steps Agents Pedrini and Pascoe had taken, entered

defendant's name into the NCIC Wanted Persons database on August 17, 2005, and entered the

federal warrant in the WIN shortly thereafter.  He researched defendant in public-records and

law-enforcement databases.  Deputy Degan also prepared a detailed collateral request for the

authorities in California that included addresses and contacts with connections to defendant that

were far more speculative than defendant's connection to the Woodward Avenue address.

Although there is no direct evidence that authorities in California exhausted the leads in Deputy

Degan's collateral request, the October 31, 2005, NCIC inquiry from the Los Angeles Police

Department supports that inference.  Even assuming <u>arguendo</u> that California authorities made

-19-

only cursory efforts regarding the 2005 collateral request investigation, the documented failure of the 2011 collateral request investigation, which was thorough, shows that the 2005 investigation would likely have been fruitless.

Defendant argues that the government's reliance solely on NCIC and database checks from November 2005 to November 2010 demonstrates its lack of diligence. The Court rejects this argument. The failure of the DEA's efforts in California in 2005 and the inferred failure of the USMS's October 2005 collateral request show that the government was unlikely to find defendant based on the information available to it as of November 2005. Accordingly, the government reasonably elected to conserve its resources and wait for new information or a change in circumstances. The DEA and USMS both monitored the case, and, crucially, the record shows that the system worked as it should: when the warrant was accidentally removed from the NCIC in 2008, Agent Pedrini had it reentered, and each time Deputy Ilagan learned of new information, he followed up on it: he performed a ruse in November 2010 and sent out a second collateral request in June 2011. When USCIS took defendant's fingerprints in July 2011, the system worked again: Deputy Ilagan received an e-mail "alert notice" and attempted to arrange another ruse. That those efforts failed, whether due to USCIS's lack of cooperation or defendant's ability to evade detection, is not persuasive.[10] The government must exercise only "reasonable diligence"; it need not "make heroic efforts." See Rayborn, 858 F.2d at 90.

---

[10] Defendant's counsel argued that the government could have simply waited outside the USCIS building, but there was no testimony that Deputy Ilagan or Deputy Dominguez had advance notice of the July 7, 2011, appointment.

**c.      Case Law Demonstrates That the Government
Exercised Reasonable Diligence**

The Court further concludes that the two cases on which defendant relies, <u>Mendoza</u> and

<u>Fernandes</u>, are not persuasive.  Even taking those cases for the proposition for which defendant

cites them—that "entering names into a database is insufficient," (Def. Reply 6) —they do not

compel a finding in defendant's favor.  In this case, the government did much more, as discussed

<u>supra</u>.  Moreover, speedy trial cases are highly fact-specific, <u>e.g.</u>, <u>Battis</u>, 589 F.3d at 678, and

<u>Mendoza</u> and <u>Fernandes</u> are both extradition cases involving facts that hardly resemble those in

this case.

More on point than <u>Mendoza</u> and <u>Fernandes</u> is <u>United States v. Spaulding</u>, 332 F. App'x

942 (11th Cir. 2009), which involves facts almost identical to this case.  In that case, the

defendant purchased cocaine from an undercover agent in September 2002.  <u>Id.</u> at 943.  To

preserve the undercover agent's identity, the authorities arrested the undercover agent and

released the defendant and his co-defendant.  <u>Id.</u>  The defendant was indicted on April 22, 2003,

and a warrant was issued, but he was not arrested until October 2007, when he was stopped for a

traffic violation and officers linked his fingerprints to the warrant.  <u>Id.</u> at 943–44.  During the

intervening years, agents undertook the following efforts: looking for the defendant at his "last

known residence"; interviewing the defendant's father; trying to contact the defendant by

telephone; investigating and performing surveillance on residences the agents believed to be

associated with the defendant; and sending the defendant's photographs to another FBI field

office.  <u>Id.</u>  The <u>Spaulding</u> court noted that the investigating agents had difficulty finding the

defendant because the address on the defendant's driver's license was a post office box.  <u>Id.</u>  The

agents in <u>Spaulding</u> "searched public databases for credit cards using [the defendant's] social

security number" and placed his name in the NCIC database.  <u>Id.</u>  However, according to the

-21-

commercial databases, the defendant's address never changed from the location the officers had monitored without success.  Id.

Addressing the defendant's arguments that the government's efforts were insufficient, the Eleventh Circuit credited the district court's finding that "the [g]overnment continued to periodically monitor the situation in an effort to locate [the defendant]" and "consistently pursued [the defendant] from indictment to arrest."  Id. at 946 (quotation marks omitted).  The Spaulding court further held, "It is true the government may have been able to do more. Yet its failure to do so was not egregious given its continuous, good-faith efforts . . . ."  Id.

The conclusion in Spaulding applies with equal force in this case.  The government may not have made herculean efforts, but it used the "reasonable diligence" that Doggett requires. 505 U.S. at 656.  Accordingly, this factor weighs slightly in the government's favor.

### 3.      Defendant's Assertion of Right

"[A] defendant's claim that the [speedy trial] right is being violated provides strong evidence that it actually was violated."  Battis, 589 F.3d at 681.  Where a defendant knows of his indictment before his arrest but fails to assert his speedy trial right, this factor weighs against him.  Doggett, 505 U.S. at 653.  However, when a defendant is unaware of the charges prior to arrest, his delay in asserting his rights does not count against him.  Id.

Defendant asserted his speedy trial right by filing his Speedy Trial Motion on March 13, 2012, less than four months after his arrest.  The government, arguing that the Court should infer that defendant knew these charges were pending no later than November 2005, (see Gov't Resp. 10), asserts that this factor of the Barker test weighs heavily in the government's favor.[11]

---

[11] In making this argument, the government pointed to the many facts supporting the inference that defendant was aware of these charges, such as the communication of the charges to his

Defendant argues that "there is no evidence that [defendant] himself was aware he was charged" in November 2005.  (Def. Reply 4 n.2.)  Under defendant's argument, this factor weighs heavily in his favor because the first direct evidence of his knowledge of these charges is the execution of the federal arrest warrant in December 2011, when he was in state custody.

The Court need not resolve the issue of defendant's knowledge.  The conclusion that the government exercised reasonable diligence necessarily compels a finding that defendant's speedy trial right was not violated if defendant does not "show specific prejudice to his defense." See Doggett, 505 U.S. at 656; see also Spaulding, 332 F. App'x at 946 ("Even assuming that [the defendant] is correct and that the third factor weighed heavily in his favor, [the defendant] would still be required to show actual prejudice because the reason for the delay did not weigh heavily against the government." (citation omitted)).  As set forth below, the Court concludes that defendant has not made such a showing.

Accordingly, the Court assumes arguendo that defendant asserted his speedy trial right in a timely manner and proceeds to consideration of prejudice.

### 4.    Prejudice to Defendant

A defendant may make a specific or a general showing of prejudice.  Battis, 589 F.3d at 682.  A specific showing involves harm to one or more of three interests protected by the speedy trial right: oppressive pretrial incarceration, anxiety or concern, or impairment of the defense. See Barker, 407 U.S. at 532.  However, "'consideration of prejudice is not limited to the

---

retained attorney, the likelihood that he learned of the failed drug transaction and arrest of his co-defendants, and the probability that whomever was living at the Woodward Avenue address informed defendant that a DEA agent was looking for him.  However, as discussed infra, the Court need not determine whether defendant was aware of the charges to resolve the Speedy Trial Motion.

specifically demonstrable,'" and thus a defendant may "claim prejudice without providing

'affirmative proof of particularized prejudice.'"  Battis, 589 F.3d at 682 (quoting Doggett, 505

U.S. at 655–56).  To counter such a claim, the government may show that "'defendant

acquiesced in the delay'" or that "'the delay left [the defendant's] ability to defend himself

unimpaired.'"  Id. (quoting Doggett, 505 U.S. at 658 & n.1) (modification in original).

       Defendant does not allege oppressive pretrial incarceration, anxiety, or concern; instead,

he asserts only impairment of his defense.  See Barker, 407 U.S. at 532.  Defendant relies almost

exclusively on the general assertion that he is prejudiced by the passage of time because

"[w]itnesses to his whereabouts and involvement may be impossible to locate and those

witnesses that are available will have impaired memories."  (Speedy Trial Mot. 9–10.)  Asked at

the hearing to identify any more specific manner in which the delay has actually prejudiced

defendant, defendant's counsel relied almost exclusively on general prejudice.  (See 6/6/12 Tr.

104–06 (arguing, inter alia, that "this case is overwhelmingly full of general prejudice" and "my

specific prejudice is the prejudice in all these cases, we can't mount a defense because we can't

even get to the witnesses in the first place").)  Defendant's counsel also argued that his ability to

investigate an entrapment defense was impaired.  (4/27/12 Tr. 120; see also 6/6/12 Tr. 104–06 ).

       The Court concludes that defendant has not demonstrated the "specific prejudice" that

Doggett requires in light of the government's reasonable diligence in pursuing him.  505 U.S. at

656.  Defendant's claims of prejudice are too general and too speculative for the Court to find

that the delay has undermined his ability to mount a defense.  See Strunk, 407 U.S. at 532

(holding that a defense is impaired if "[i]f witnesses die or disappear during a delay" or "defense

witnesses are unable to recall accurately events of the distant past").  Moreover, the Court agrees

with the government that this is a case in which "the delay left [the defendant's] ability to defend

himself unimpaired." Battis, 589 F.3d at 682 (quotation marks omitted). Contrary to defendant's claim that "[n]early all of the evidence against Mr. Velazquez is witness testimony by co-defendants who have long been incarcerated (and may have strong reason to fabricate cooperation . . . )," (Def. Reply 10), a significant portion of the evidence is unchanged. Defendant's meeting with the CI and Curiel in Philadelphia on July 3, 2005, was recorded, as were his phone conversations with the CI prior to the cocaine transaction. Furthermore, transcripts are available from Gutierrez-Gainza's trial—at which both Curiel and Gutierrez-Gainza testified—and can be used for impeachment, diminishing concerns of fabricated testimony.

The Court also rejects defendant's argument that his ability to mount an entrapment defense has been impaired for the same reason: defendant failed to identify any specific witness or piece of evidence that he now cannot access. To the contrary, as the Court pointed out at the hearing, (6/6/12 Tr. 104), defendant's counsel has already received the evidence that would be central to an entrapment defense because he has received the tape recordings of defendant's conversations with the CI.

The Court thus concludes that defendant's "bare assertion of prejudice, without more, is insufficient to establish actual prejudice." See Spaulding, 322 F. App'x at 948 (rejecting defendant's claim that his ability to investigate an entrapment defense was impaired, particularly in light of the availability of tape recordings of the charged drug transaction and related conversations).

## C.    Conclusion

The evidence of the government's reasonable diligence in pursuing defendant and absence of specific prejudice to the defense outweigh the length of the delay and defendant's

-25-

assertion of his speedy trial right.  See Doggett, 505 U.S. at 656; see also United States v. Loud Hawk, 474 U.S. 302, 316 (1986) (referring to the reason for the delay as "[t]he flag all litigants seek to capture").  Weighing all of the factors discussed above, the Court concludes that defendant's Sixth Amendment speedy trial right has not been violated.

IV.   **CONCLUSION**

There has been no violation of defendant's right to a speedy trial as guaranteed by the Sixth Amendment.  The Court therefore denies defendant's Speedy Trial Motion

An appropriate Order follows.